[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 18-11633

_____

D.C. Docket No. 3:15-cr-00067-BJD-JRK-1

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

versus

RUSSEL LEE ORR,

Defendant - Appellant.

_____

Appeal from the United States District Court
for the Middle District of Florida

_____

(July 1, 2020)

Before JORDAN, TJOFLAT, and TRAXLER,* Circuit Judges.

_____

* The Honorable William B. Traxler, Circuit Judge for the United States Court of Appeals for the Fourth Circuit, sitting by designation.

PER CURIAM:

Russel Lee Orr appeals his convictions for attempted enticement of a child to engage in sexual activity, attempted production of child pornography, and multiple counts of advertising to receive child pornography.  Mr. Orr argues that the district court committed numerous errors that warrant reversal, including its refusal to give a requested jury instruction on the defense's theory of the case.  We disagree, and therefore affirm.

**I**

**A**

On March 10, 2015, Mr. Orr responded by email to an advertisement in the Orlando area personal section of Craigslist.  The advertisement, titled "Special Needs Need Special Attention," said the following: "Looking for some help with a special needs situation, must be discreet, safe, and open minded."  Gov't Supp. App'x Vol. III at 60.

Unbeknownst to Mr. Orr, the advertisement had been posted by an undercover law enforcement officer, Sgt. Stephen Gazdick of the St. Johns County Sheriff's Office in St. Augustine, Florida.  Mr. Orr asked Sgt. Gazdick about the "needs situation" and Sgt. Gazdick, posing as an adult male named "George Michaels," explained that he had custody of his 14-year-old deaf niece, and that she had been

2

asking for help making a "special friend that will teach her things that [he] cannot." *Id.* at 62.

As the email exchange continued into the next day, Mr. Orr asked about the things "George" was willing to let his niece do and confirmed with "George" that the niece wanted to be taught about "getting oral" and "full sex." *Id.* at 64–65. Mr. Orr asked whether the niece was "really up for those things[,]" and whether she understood "the general [d]ynamics of losing her virginity[.]" *Id.* at 65–66.

Eventually, at Mr. Orr's request, "George" sent a photograph of his niece that showed him sitting next to what appeared to be a prepubescent female but was in reality an adult law enforcement officer whose appearance had been digitally altered to make her appear younger and smaller. Mr. Orr wanted more photographs, and asked for "a selfie nude pic with [the niece's] face in it" to "help her to see if she really want to go through [with] this" and also to "show this isn't a police sting operation." *Id.* at 67. Mr. Orr wrote that the photos should include "face . . . boobs and puss[,]" again, to help ensure that their exchange was not "some sort of sting" since "[p]olice don't transmit photos of girls naked[.]" *Id.* at 69. When asked whether the girl should be in specific poses, Mr. Orr responded that he wanted a "back shot of ass and pussy lips," "[o]ne sitting with legs spread[,] [a] [c]lose up of pussy, [a]nd any others u think are sexy[.]" *Id.*

3

"George" responded that his niece was already in bed for the night but gave Mr. Orr a cell phone number to text her directly.  Mr. Orr continued to exchange emails with "George" and, the day after he responded to the Craigslist post, also started texting with the niece, "Emily Shannon," who was also being played by Sgt. Gazdick.  On that first day Mr. Orr and "Emily" began texting, and after mentioning the photographs he had requested from her uncle, he explained that he wanted to make sure this was not a police sting operation and that he did not want the police to come around because of their age difference and the fact that "Emily" was under 18.  "Emily" said "im not 18, im 14" and Mr. Orr said "George" had told him of her age.  Gov't Supp. App'x Vol. IV at 46.

Mr. Orr continued to email and text with "George" and "Emily" for the next two months.  He kept asking for pictures of "Emily," repeatedly referencing the nude pictures he had requested from "George" or asking for new pictures, including pictures of her in her bra and underwear and pictures of her vagina, breasts, and naked body.  He also frequently described sexual acts that he wanted to teach her and do with her.  Although "Emily" and Mr. Orr frequently discussed meeting in person or making plans to do so, Mr. Orr never traveled to meet her.

On May 21, 2015, law enforcement arrested Mr. Orr at his apartment based on an indictment charging him with child enticement, production of child pornography, and multiple counts of publishing a notice or advertisement seeking

4

child pornography. Two officers—Sgt. Gazdick and FBI Special Agent Abbigail Beccaccio—met with Mr. Orr in a police car in his building's parking lot immediately after the arrest. Sgt. Gazdick gave Mr. Orr his warnings under *Miranda v. Arizona*, 384 U.S. 444 (1966), and Mr. Orr signed a form indicating that he had read his statement of rights, understood what his rights were, and was willing to answer questions without a lawyer present.

Mr. Orr's interview was recorded and lasted approximately two hours. It began with basic biographical questions about Mr. Orr, including his education level and previous jobs. Sgt. Gazdick eventually told Mr. Orr that officers had received a complaint about communications to and from a Gmail email account under Mr. Orr's name involving an underage person. Mr. Orr immediately said that he knew that meeting or trying to meet underage girls was illegal but that engaging in role-playing or fantasy was different. Sgt. Gazdick showed Mr. Orr the Craigslist advertisement and the emails and text messages he had exchanged with "George" and "Emily," and the officers asked him several questions about the conversations.

Mr. Orr denied that he ever intended to travel to meet "Emily," and claimed throughout the interview that all he was doing was role-playing. At times the officers agreed with things Mr. Orr said, such as, for example, when Sgt. Gazdick agreed that Mr. Orr had not gone to meet an underage child. They did not reveal to Mr. Orr

that "George" and "Emily" were fictitious identities and that Sgt. Gazdick had been pretending to be both "Emily" and her uncle the entire time.

At the same time Mr. Orr was arrested, law enforcement officers executed a search warrant at his apartment. They found his cellphone and, after analyzing its content, determined that the cellphone's user had searched the internet for the terms "underage porn" and "early teenage sex" on May 18, 2015. The officers did not find any child pornography on the phone, in Mr. Orr's apartment, or on his computer.

**B**

A grand jury returned a superseding indictment charging Mr. Orr with one count of knowingly and willfully attempting to induce and entice a minor to engage in sexual activity for which a person can be charged with the production of child pornography, 18 U.S.C. §§ 2251(a) and 2422(b) (Count 1); one count of knowingly and willfully attempting to induce and entice a minor to engage in any sexually explicit conduct for the purpose of producing visual depictions of the conduct, 18 U.S.C. § 2251(a), (e) (Count 2); and eight counts of knowingly making a notice and advertisement seeking and offering to receive visual depictions involving the use of a minor engaging in sexually explicit conduct, 18 U.S.C. §§ 2251(d)(1)(A), (2)(B) and 2251(e) (Counts 3 through 10).

After Mr. Orr pleaded not guilty, his case proceeded to trial. He filed several pre-trial motions, including a motion to suppress statements and a motion to suppress

physical evidence.  He sought to exclude incriminating statements made during his interview with Sgt. Gazdick and Special Agent Beccaccio on the ground that they were involuntary because the officers procured them by withholding information about the charges and by acting like his friend to gain his trust and confidence.  He also sought to exclude the items seized in the search of his apartment, arguing that the warrant was not specific to the items to be seized and was not supported by probable cause.  The district court denied both motions.

At trial, the government called several witnesses, including Sgt. Gazdick and Special Agent Beccaccio.  Sgt. Gazdick testified that he placed the Craigslist advertisement and communicated with Mr. Orr under the invented personas of "George Michaels" and "Emily Shannon."  He and Special Agent Beccaccio read portions of the text messages between Mr. Orr and "Emily," with Sgt. Gazdick acting as Mr. Orr and Special Agent Beccaccio acting as "Emily."  At the close of the government's case, Mr. Orr's counsel orally moved for a judgment of acquittal under Federal Rule of Criminal Procedure 29(a), which was denied by the court.  Mr. Orr did not testify or present any evidence.

At the charge conference, Mr. Orr objected to the district court's refusal to provide his requested jury instruction on the defense theory that he had been role-playing or engaging in fantasy when he was communicating with "George" and "Emily."  The district court ultimately decided to provide a pattern instruction as to

7

intent, concluding that it would give the jury sufficient direction on the matter of specific intent.

The jury returned a verdict of guilty as to all the charges in the superseding indictment. The district court denied Mr. Orr's written motion for a judgment of acquittal or a new trial.

Before sentencing, the probation office prepared a report which set Mr. Orr's base offense level at 32 and provided for a total offense level of 36 based on two two-level enhancements. One of the enhancements pertained to offenses involving a minor between 12 and 15 years of age. *See* U.S.S.G. § 2G2.1(b)(1)(B). The other enhancement related to offenses involving the use of a computer. *See* U.S.S.G. § 2G2.2(b)(6). The report established the advisory guideline range as 188 months to 235 months of imprisonment. Mr. Orr filed objections to both enhancements, arguing that they constituted impermissible double counting because elements of the crimes were already fully accounted for by application of other provisions of the Sentencing Guidelines.

At the sentencing hearing, the district court overruled the objections and sentenced Mr. Orr on the ten counts of his indictment to a total term of 180 months in custody, to be served concurrently, followed by 120 months of supervised release. This constituted an eight-month downward variance from the low end of the advisory guidelines range to the mandatory minimum sentence.

8

## II

Mr. Orr appeals on multiple grounds.  We address each of them below.

## A

Mr. Orr first argues that the district court should have suppressed his statements because they were obtained in violation of the Fifth Amendment.  We review a district court's findings of fact in resolving a motion to suppress for clear error.  *See United States v. Spoerke*, 568 F.3d 1236, 1244 (11th Cir. 2009).  We review the district court's application of the law to those facts *de novo*.  *See id.*  We construe the facts in the light most favorable to the party that prevailed on the motion, here the government.  *See id.*

A suspect may waive his Fifth Amendment privilege against self-incrimination if the waiver is voluntary, knowing, and intelligent.  *See Colorado v. Spring*, 479 U.S. 564, 572 (1987) (citing *Miranda*, 384 U.S. at 436).  The inquiry into the voluntary, knowing, and intelligent nature of a waiver has "two distinct dimensions."  *Id.* at 573 (citation and internal quotation marks omitted).  First, to be voluntary, the waiver must have been "the product of a free and deliberate choice rather than intimidation, coercion, or deception."  *Id.* (citation omitted).  Second, to be knowing and intelligent, a waiver "must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it."  *Id.* (citation omitted).  A court must consider the totality of the

9

circumstances surrounding the interrogation to determine whether a suspect's decision was voluntary, knowing, and intelligent. *See id.*

Examining the relevant circumstances here, we conclude that Mr. Orr's statements were made voluntarily. There are none of the usual markers of police misconduct or coercion. The officers did not make any direct or implied promises to induce cooperation, much less overtly threaten or harm Mr. Orr to extract a confession. *See United States v. Lall*, 607 F.3d 1277, 1285–86 (11th Cir. 2020) (discussing how promises of non-prosecution can distort the suspect's choice and make it impossible for him to make a rational decision about whether to confess). The officers also did not deceive Mr. Orr about the law.

Even if we accept Mr. Orr's argument that the officers lied to him about the facts, misrepresentations of fact are generally not enough to render a confession involuntary. *See id.* at 1285–86 (distinguishing misrepresentations of law and explaining that misrepresentations of fact are generally permitted). The officers did not tell Mr. Orr that they had been investigating him for several weeks and that they had significant cellphone text and email evidence against him, but we have never held that *Miranda* or the Fifth Amendment requires officers to disclose to a suspect all the details of an investigation or all the evidence they have assembled against him.

The totality of the circumstances persuades us that Mr. Orr's statements were also knowingly and intelligently made. At the time of the arrest, Mr. Orr was a 39-year-old adult of at least normal intelligence, and there is no indication that he did not understand his *Miranda* rights or the waiver form that he signed. And nothing the officers did after his waiver compromised his ability to understand the nature of his rights or the consequences of abandoning them.

Mr. Orr nevertheless argues that because he was not told why he was being arrested, and was not informed that he was being questioned about a criminal offense, he could not knowingly and intelligently waive his right against self-incrimination. The Constitution, however, "does not require that a criminal suspect know and understand every possible consequence of a waiver of the Fifth Amendment privilege." *Spring*, 479 U.S. at 574 (citing *Moran v. Burbine*, 475 U.S. 412, 422 (1986)). The waiver form that Mr. Orr signed clearly stated that he had read his statement of rights, understood his rights, and was willing to answer questions without a lawyer present—and that anything he said could be used against him in court. The lack of qualification in that "broad and explicit warning. . . . conveys to a suspect the nature of his constitutional privilege and the consequences of abandoning it." *Id.* at 577.

Mr. Orr tries to distinguish *Spring* by suggesting that the confession in that case was valid because the defendant had been made aware that law enforcement

11

was interrogating him about at least one criminal act, even though they did not advise him that they might be questioning him about a separate crime. But this is too narrow a reading of *Spring*. Central to the holding in *Spring* was the lack of any coercive police conduct and the defendant's understanding of his right to remain silent—not the fact that he was aware that he had been arrested for at least one criminal offense. *See id.* at 573–75. The arrest, handcuffing, placement in a law enforcement vehicle, and questioning by local and federal officers in that vehicle should have cued Mr. Orr that, in the words of the district court, this was "something less than a courtesy call" and was related to suspected criminal conduct. *See* D.E. 66 at 13.

Mr. Orr also contends he was tricked by the officers both because they did not reveal the charges against him and because they acted in a friendly manner. We start out by noting that the Supreme Court has sanctioned a certain degree of "strategic deception" in police interrogations that otherwise do not run afoul of *Miranda*. *See Illinois v. Perkins*, 496 U.S. 292, 297 (1990). In *Spring*, for example, the Court explicitly rejected the contention that mere silence by an officer as to the subject matter of an interrogation even qualified as trickery. *See* 479 U.S. at 576. The friendly demeanor of law enforcement officers during an interrogation also does not create Fifth Amendment concerns. *See Perkins*, 496 U.S. at 297 ("Ploys to mislead a suspect or lull him into a false sense of security that do not rise to the level of compulsion or coercion to speak are not within *Miranda*'s concerns.") (citations

12

omitted).  Indeed, the Court has sanctioned similar strategies that involved more affirmative misdirection on the part of law enforcement than what was present here. *See id.* at 297–298 (upholding confession to an undercover agent posing as a cellmate).  *See also Moran*, 475 U.S at 421–22 (police failure to inform suspect of attorney's efforts to reach him did not invalidate waiver of *Miranda* rights).

Given the precedent discussed above and the circumstances of the case, we hold that Mr. Orr voluntarily, knowingly, and intelligently waived his rights against self-incrimination.  The district court correctly denied his motion to suppress his statements.

**B**

Mr. Orr filed a separate motion to suppress evidence found in his apartment. He argues on appeal that the search warrant lacked probable cause because only "George Michaels," the would-be victim's uncle and not "Emily," the victim herself, told Mr. Orr that she was 14 years old and because the affidavit supporting the warrant did not append images of sexually explicit conduct or provide sufficient factual details describing any such images.

We apply the same *de novo* standard to review a motion to suppress evidence as we do for a motion to suppress statements.  *See United States v. Anderton*, 136 F.3d 747, 749 (11th Cir. 1998).  Affidavits supporting arrest warrants are presumptively valid.  *See United States v. Jenkins*, 901 F.2d 1075, 1080 (11th Cir.

13

1990) (citing *Franks v. Delaware*, 438 U.S. 154, 171 (1978)).  And we afford "[g]reat deference" to a lower court's probable cause determination.  *See United States v. Brundidge*, 170 F.3d 1350, 1352 (11th Cir. 1999) (citation omitted).

The district court denied Mr. Orr's motion, concluding that the warrant precisely detailed the place and items to be searched and seized, and that all the items described bore a substantial relationship to the commission of the child exploitation felonies for which there was probable cause.  These findings are not erroneous.

"Probable cause to support a search warrant exists when the totality of the circumstances allow a conclusion that there is a fair probability of finding contraband or evidence at a particular location."  *Id.* (citing *United States v. Gonzalez*, 940 F.2d 1413, 1419 (11th Cir. 1991)).  If the apparent facts from the affidavit would lead a "reasonably discreet and prudent [person]" to believe that the charged offense was committed, there is probable cause justifying the issuance of the warrant.  *Jenkins*, 901 F.2d at 1080 (citation omitted).  Considering the totality of the circumstances, and affording deference to the district court, we agree with its determination that the warrant was supported by probable cause.

Special Agent Beccaccio's affidavit, which provided the factual basis for the warrant, specified that the investigation concerned alleged violations of 18 U.S.C §§ 2251, 2252, and 2252A, which prohibit the sexual exploitation of minors.  It set out her training and experience investigating child pornography, the way in which

computer technology has revolutionized the manufacture and distribution of child pornography, and the tendency of child pornographers to store images of child pornography in their computers and on other forms of digital media (which were included in the list of items to be seized and searched that was attached to the warrant application). The affidavit asserted that, based on her experience and training, individuals who traffic and trade in child pornography also frequently collect child pornography, are sexually attracted to children, and use the internet to communicate with potential child victims.

Special Agent Beccaccio's affidavit provided the background facts of the investigation, including Mr. Orr's response to Sgt. Gazdick's Craigslist advertisement and sexually explicit excerpts from the messages and requests for photographs that were exchanged between Mr. Orr and Sgt. Gazdick acting as "Emily" and "George." The affidavit relayed how Sgt. Gazdick, acting as the victim's uncle, informed Mr. Orr that his niece was 14 years old and how, acting as "Emily," he told Mr. Orr "im not 18, im 14" when Mr. Orr brought up the "age difference of un [*sic*] under 18…"

The affidavit provided a sufficient basis to conclude that there was a fair probability of finding contraband or evidence at Mr. Orr's apartment. It demonstrated that Mr. Orr knew "Emily" was a minor and that he was seeking and requesting sexually explicit visual depictions of a minor. The details regarding Mr.

15

Orr's behavior throughout the investigation, and information regarding the general tendencies of child pornographers based on past investigations, established a nexus between the criminal conduct and Mr. Orr's apartment, indicating that law enforcement would find evidence there related to advertising for, receiving, distributing, and possessing child pornography. *Cf. Jenkins*, 901 F.2d at 1080–81 ("[E]vidence that a defendant has stolen material which one normally would expect him to hide at his residence will support a search of his residence.") (citation omitted).

Although the government did not attach photographs or describe specific pornographic images officers expected to find at the apartment, there is no requirement that it do so given the other details provided in the affidavit. Probable cause for child pornography offenses does not depend on law enforcement having proof that child pornography is in the defendant's possession. *See generally United States v. Williams*, 444 F.3d 1286, 1304 n.87 (11th Cir. 2006) (citing cases and explaining that several courts have held that affidavits indicating a defendant has joined internet groups where members exchange child pornography provide probable cause to search his home although there was no evidence of any downloads of illegal child pornography), *overturned on other grounds by* 128 S. Ct. 1830 (2008).

Affording deference to the district court's probable cause determination and considering the totality of the circumstances, we conclude that there was probable cause to issue the arrest warrant. The district court correctly denied Mr. Orr's motion to suppress the physical evidence.

## C

Mr. Orr next maintains that there was insufficient evidence to support his convictions and that the district court erred by denying his motion for judgment of acquittal and motion for judgment notwithstanding the verdict. We disagree.

We review challenges to the sufficiency of the evidence, motions for judgment of acquittal, and motions for judgment notwithstanding the verdict *de novo*. *See United States v. Hernandez*, 433 F.3d 1328, 1332 (11th Cir. 2005). A district court considering motions for judgment of acquittal and judgment notwithstanding the verdict should apply the same standard used in reviewing a challenge based on the sufficiency of the evidence. *See United States v. Ward*, 197 F.3d 1076, 1079 (11th Cir. 1999). Challenges to the sufficiency of the evidence require a district court to determine whether "a reasonable juror could conclude that the evidence establishes guilt beyond a reasonable doubt," viewing the evidence "in the light most favorable to the verdict." *United States v. Takhalov*, 838 F.3d 1168, 1169 (11th Cir. 2016) (citations and internal quotation marks omitted). *See also United States v. Taylor*, 972 F.2d 1247, 1250 (11th Cir. 1992); *United States v. Descent*, 292 F.3d 703, 706

17

(11th Cir. 2002). "It is not necessary for the evidence to exclude every reasonable hypothesis of innocence or be wholly inconsistent with every conclusion except that of guilt," because "[a] jury is free to choose among reasonable constructions of the evidence." *Ward*, 197 F.3d at 1079 (citations and internal quotation marks omitted).

Counts One and Two charged Mr. Orr with attempts to entice a child to engage in sexual activity and to produce child pornography in violation of 18 U.S.C. §§ 2422(b) and 2251(a). To establish a violation of § 2422(b), the government must prove that the defendant "intended to cause assent on the part of a minor" to engage in sexual activity, and that he took a substantial step toward causing that assent. It does not have to prove that the defendant acted with the specific intent to engage in an actual sexual activity, nor that he took a substantial step toward sexual contact. *See United States v. Lee*, 603 F.3d 904, 914 (11th Cir. 2010) (internal quotation marks and citation omitted). To establish a violation of § 2251(a), the government must show that a defendant intentionally attempted to use minors to produce child pornography. *See id.* at 918. A defendant takes a substantial step "when his objective acts mark his conduct as criminal and, as a whole, strongly corroborate the required culpability." *Id.* at 914 (internal quotation marks and citation omitted). For both offenses, a minor can be a law enforcement officer acting in an undercover capacity or a fictitious minor. *See id.* at 913 (stating that 18 U.S.C. §§ 2422(b) and 2251(a), (e) do not require an actual minor victim and that attempts to exploit

18

fictitious minors can support a conviction). *See also United States v. Orrega*, 363 F.3d 1093, 1097–98 (11th Cir. 2004) (reviewing the district court's grant of a downward departure at sentencing, and stating that a defendant who had conversations asking to engage in sexual acts with an undercover agent posing as a thirteen-year-old girl had attempted to entice a minor to engage in a sexual act under 18 U.S.C. § 2422(b)).

Although Mr. Orr did not travel to meet with "Emily," he emailed and texted extensively with an undercover officer posing as both a would-be minor victim and her uncle. He repeatedly asked for sexually explicit photos of the minor, discussed sex with the purported minor, and described the sexual acts he wanted to perform with her and on her. In *Lee*, we upheld the defendant's convictions under §§ 2422(b) and 2251(a) based on similar conduct. *See* 603 F.3d at 914–918 (finding sufficient evidence to support conviction under §§ 2422(b) and 2251(a) even though the defendant did not travel to or meet with the minors, based on, among other conduct, initiating contact with an adult whom the defendant believed to be interested in providing sexual access to the minors, expressing concerns about falling into a police trap, requesting sexually explicit photographs of the minors, expressing his seriousness about meeting the minors, and discussing travel details to meet the minors). Thus, viewing the evidence in the light most favorable to the government, we conclude that there was enough evidence for a reasonable jury to find Mr. Orr

guilty beyond a reasonable doubt of the offenses charged under §§ 2422(b) and 2251(a).

The remaining eight counts—Counts Three to Ten—charged Mr. Orr with making a notice or advertisement seeking or offering to receive any visual depiction of a minor engaging in sexually explicit conduct in violation of 18 U.S.C. §§ 2251(d)(1)(A), (2)(B) and 2251(e).  Mr. Orr has arguably waived any challenge to the § 2251(d)(1)(A), (2)(B) convictions by failing to discuss them in his briefing. *See Sapuppo v. Allstate Floridian Ins. Co.*, 739 F.3d 678, 681 (11th Cir. 2014).  But even if we overlook the briefing deficiency, we conclude that there was sufficient evidence.  A reasonable jury could find beyond a reasonable doubt that he knowingly made notices and advertisements seeking and offering to receive images of child pornography based on his multiple and graphically detailed requests for specific images of child pornography.

We may not overturn a verdict if there exists "any reasonable construction of the evidence that would have allowed the jury to find the defendant guilty beyond a reasonable doubt."  *United States v. Wilson*, 788 F.3d 1298, 1308 (11th Cir. 2015) (citation omitted).  Because we have found that permissible interpretations of the evidence support all of Mr. Orr's convictions, we affirm the district court's denials of the motion for acquittal and motion for judgment notwithstanding the verdict.

**D**

Mr. Orr argues that the district court committed reversible errors in allowing inadmissible evidence that had a prejudicial impact on the jury, and contends that these mistakes resulted in cumulative error. We review a district court's decision to admit evidence for abuse of discretion. *See United States v. Bradberry*, 466 F.3d 1249, 1253 (11th Cir. 2006). The district court generally has "wide discretion" in making evidentiary judgment calls. *See United States v. Stephens*, 365 F.3d 967, 973 (11th Cir. 2004) (citation omitted). And "[o]nly if the decision to admit evidence. . . is unsupportable when the evidence is viewed in the light most supportive of the decision will we say that the decision constitutes an abuse of discretion." *Bradberry*, 466 F.3d at 1253 (internal quotation marks and citation omitted). Moreover, "[a]n erroneous evidentiary ruling will result in reversal only if the resulting error was not harmless." *United States v. Frediani*, 790 F.3d 1196, 1200 (11th Cir. 2015) (internal quotation marks and citation omitted).

Mr. Orr makes six discernable claims of error with respect to improper admission of evidence. Specifically, he argues it was error for the district court to (1) admit Sgt. Gazdick's testimony that some investigations involved individuals who traveled to meet victims; (2) admit Sgt. Gazdick's testimony of emails received from Mr. Orr; (3) admit as evidence the copy of the Craigslist advertisement that Sgt. Gazdick had posted; (4) admit as evidence six exhibits containing emails

21

between Mr. Orr and Sgt. Gazdick posing as "George" and "Emily"; (5) allow Sgt. Gazdick and Special Agent Beccaccio to read out text messages between Mr. Orr and "Emily," playing the parts of Mr. Orr and "Emily" respectively; and (6) allow Sgt. Gazdick to provide a legal conclusion by testifying that police are not allowed to send child pornography but are allowed to send a doctored image, pretend to be a child, or use a fake name as part of an investigation.

For each of these claims, Mr. Orr relies on conclusory assertions regarding the prejudicial nature of the testimony or evidence. Aside from identifying the applicable legal standard for some of the challenges or describing the basis of the objection at trial, he does not cite any legal support for his arguments. Mr. Orr's first two claims of error, for example, assert that the district court admitted irrelevant testimony by Sgt. Gazdick related to past investigations and suspects' travel. But apart from citing legal authority to define what constitutes relevant evidence and summarily stating that Sgt. Gazdick's testimony was irrelevant and prejudicial, Mr. Orr does not explain to us in his briefs why this information is actually irrelevant or how he might have been harmed by its admission. This approach is emblematic of his treatment of the remaining claims of error. In light of this failure, we reject these challenges. *See Sapuppo*, 739 F.3d at 681 ("[A]n appellant abandons a claim when he either makes only passing references to it or raises it in a perfunctory manner without supporting arguments and authority.") (citation omitted).

22

Without contrary explanation from Mr. Orr or anything beyond a conclusory assertion that these alleged errors had a prejudicial effect on him, we also conclude that any errors were harmless.  Furthermore, because we do not hold that admission of any of this evidence was erroneous, there can be no cumulative error.  *See United States v. Gonzalez*, 834 F.3d 1206, 1227 (11th Cir. 2016) (noting that because there was no error, there could be no cumulative error) (citations omitted).

**E**

Mr. Orr next challenges the district court's failure to provide a requested defense theory instruction.  A defendant is entitled to a theory of the defense instruction for which there is any evidentiary foundation, "even though the evidence may be weak, insufficient, inconsistent, or of doubtful credibility."  *United States v. Opdahl*, 930 F.2d 1530, 1535 (11th Cir. 1991) (quoting *United States v. Lively*, 803 F.2d 1124, 1126 (11th Cir. 1986)).

A district court's refusal to deliver a requested instruction to the jury is reviewed for abuse of discretion.  *See United States v. Woodard*, 531 F.3d 1352, 1364 (11th Cir. 2008).  The district court commits reversible error if "(1) the requested instruction was a correct statement of the law, (2) its subject matter was not substantially covered by the charge actually given, and (3) its subject matter dealt with an issue in the trial court that was so important that the failure to give it seriously

23

impaired the defendant's ability to defend himself." *Id.* (quoting *United States v.*

*Paradies*, 98 F.3d 1266, 1287 (11th Cir. 1996)).

Mr. Orr's requested instruction read as follows:

> A major component of the entertainment on the Internet is the rapid repartee, in addition to having imaginative fun. When engaging in Internet role-play, people love to experiment with their personas. Typically, people weave a bit of truth about themselves with a great deal of imagination and/or exaggeration. Sexually explicit conversations tend to drive the chatting relationship, and are fueled by the anonymity of the created personas. Often, chatters become curious about who is 'behind the screen.' There are many methods chatters use to 'de-mask' the other participant: such as asking for a photograph, attempting a phone conversation, asking for information that can be independently verified or even attempting to meet in a public space.

> The Defendant has claimed that he was merely role playing or living out a fantasy and that he believed it was an adult pretending to be a child and that he had no intent to entice or coerce anyone under 18 years old to engage in any sexual activity.

D.E. 87 at 25.[1]

The first paragraph of Mr. Orr's requested instruction is little more than a

defendant-friendly commentary on the evidence. For example, the instruction states

that people "typically" weave a bit of truth about themselves with a great deal of

imagination, and that sexually explicit conversations "tend to drive the chatting

relationship." It is only in the last sentence of the proposed instruction that we get

---

[1] In the annotations and comments for the requested instruction, Mr. Orr cited *Friedlander v. United States*, 570 F. App'x 883 (11th Cir. 2014) as legal support for the requested instruction's language. *Friedlander* deals with expert testimony related to internet fantasy in child pornography cases. *See id.* at 885.

24

the legally recognizable defense, relating to the lack of the requisite criminal intent: that because "Mr. Orr was merely role playing or living out a fantasy," "he had no intent to entire or coerce" a minor to engage in sexual activity. *Id.*

As Mr. Orr conceded at oral argument, the first part of his instruction was too argumentative. *See* Oral Argument Recording at 6:58–7:16 (agreeing with the court that "added verbiage" in the requested instruction "constitutes comment on the evidence and is unnecessary verbiage"). And our cases hold that a defendant is not entitled to an instruction that is more in the nature of legal argument or a judicial narrative of his version of the facts than an objective instruction on the law. *See United States v. Barham*, 595 F.2d 231, 244–45 (5th Cir. 1979). The district court therefore did not err by refusing to give his instruction, and had no duty to re-write it. Had the district court done otherwise, it would have impermissibly "place[d] . . . the defendant['s] desired factual findings into the mouth of the court," *Paradies*, 98 F.3d at 1287 (citation omitted), instead of fulfilling its role of providing the jury with neutral guidance about the issues for deliberation.

## F

Mr. Orr's final arguments are that the district court erroneously applied sentencing enhancements that constituted impermissible double counting or stacking, and by denying a request for a downward variance. At oral argument, counsel conceded that "any error with respect to the calculation or application of the

specific offense characteristics leading to the calculation of the adjusted offense level is harmless because the district court in this matter imposed the mandatory minimum sentence." Oral Argument Recording at 3:45–4:02. *See also id.* at 4:10–4:25 ("The court imposed the mandatory minimum of 180 months and again regardless of what feelings trial counsel may have had with respect to the arguments regarding the specific offense characteristics they had no impact on the sentence that would be imposed."). The same goes for any claim that the district court should have varied downward by more, as it could not go below the 180-month statutory minimum. Because Mr. Orr has waived these arguments, and they in any event lack merit, we do not address them further.[2]

## IV

After a close review of the record, briefing, and applicable law, and with the benefit of oral argument, we affirm Mr. Orr's conviction and sentence.

**AFFIRMED.**

---

[2] Mr. Orr's original trial counsel filed the opening brief, but Mr. Orr retained substitute counsel to file the reply brief and represent him at oral argument.